MARSHALL RICK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rick v. Commissioner
Docket No. 28801-81.
United States Tax Court
T.C. Memo 1987-427; 1987 Tax Ct. Memo LEXIS 424; 54 T.C.M. (CCH) 295; T.C.M. (RIA) 87427; August 26, 1987. Harvey R. Poe and Carey Gage, for the petitioner. Richard J. Sapinski and Richard F. Flaherty, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows: Sec. 6653(b) [1]
Year
Deficiency
Addition
1975
$ 9,764.40
$ 4,882.40
1976
12,591.48
6,295.74
1977
[2] 459.24
14,589.12
*425 Petitioner concedes the correctness of respondent's deficiency determinations as set forth in the notices of deficiency for all the years in issue, with certain minor concessions made by respondent as set forth in the parties' stipulation of facts. Petitioner also concedes that he is collaterally estopped from contesting the section 6653(b) fraud addition for the taxable year 1976 due to his conviction under section 7201 for that year. By Amendment to Answer, [3] respondent has asserted an increase in the deficiency and the addition to tax for the taxable year 1977 in the amounts of $ 2,686.34 and $ 1,343.17, respectively. *426 The issues remaining for decision are: (1) Whether petitioner had additional unreported income in 1977 resulting from interest of $ 345 and a lump-sum distribution from a profit-sharing plan in that year in the amount of $ 4,922; and (2) Whether petitioner is liable for the addition to tax under section 6653(b) for fraud for the taxable years 1975 and 1977. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, the second stipulation of facts, and the exhibits attached there to, are incorporated herein by this reference. Petitioner, Marshall Rick, resided at 164 South Harrison Street, East Orange, New Jersey at the time he filed his petition in this case. He has resided at that address from at least March of 1971 up to the time of trial. He timely filed his individual 1975, 1976, and 1977 Federal income tax returns (Forms 1040) with the Internal Revenue Service Center in Holtsville, New York. On September 8, 1978, petitioner filed an amended Federal income tax return (Form 1040X) for the taxable year 1977. On November 14, 1978, petitioner filed amended Federal income tax returns (Forms 1040X) for the taxable years 1975 and *427 1976. After serving in the United States Army for 21 years, petitioner retired in 1962 with the rank of Lieutenant Colonel. Prior to joining the Army, petitioner had worked for Kresge Department Store for approximately 10 years. He began working for Kresge shortly after finishing high school. During his years in the United States Army, petitioner took correspondence courses from the University of Wisconsin and the United States Armed Forces Institute. He also attended the Command and General Staff College at Fort Leavenworth. In addition, petitioner attended the Army Finance School at Fort Benjamin Harrison to learn the new accounting system that the Army had put into effect. In sum, petitioner received the equivalent of a four-year college education while in the Army with some concentration of courses in business administration, accounting and office management. Petitioner's last post of duty in the Army was Fort Dix, New Jersey, where he was stationed for approximately two and a half years. At the time of his retirement, petitioner held the position of Finance Officer in the Office of the Comptroller at Fort Dix. In this position, petitioner was in charge of an office *428 employing approximately 120 people, of which 100 were civilians and 20 were military personnel. The six or seven section heads within the office reported directly to petitioner, who served as the financial officer for the entire base. As head of the finance office, petitioner's responsibilities included ensuring that the civilians, the military, and the various contractors on the base were properly paid. Petitioner retired from the Army in order to start a new career and pursue new opportunities. Subsequent to his retirement, petitioner obtained employment with Ragen Precision Industries (hereinafter referred to as Ragen). Petitioner was employed full-time with Ragen from 1963 until his second retirement in June of 1977. Petitioner was originally hired by Ragen to service a defense contract that one of its subsidiaries had with a company called United Nuclear. This defense contract required the company representative to have a United States Government security clearance, and petitioner had such a clearance from the Army. At the time of his retirement from Ragen, petitioner held the office of corporate vice-president and held the title of chief of the component manufacturing *429 division, Ragen's largest division. Approximately 90 employees worked in that division. Petitioner was personally in charge of servicing the contracts of Ragen's largest customers, which including IBM and Xerox. Moreover, during 1975 through 1977, petitioner also served as one of the five inside members of the board of directors of Ragen, a publicly held corporation. Ragen's annual financial statements referred to petitioner as Lieutenant Colonel Marshall Rick. During the years involved in this case, petitioner maintained a savings account at the Carteret Savings and Loan Association, (hereinafter sometimes referred to as Carteret), a savings account at the Midlantic National Bank (hereinafter sometimes referred to as Midlantic) and a checking account at the Broad National Bank (hereinafter sometimes referred to as Broad). All three of these financial institutions were located within 100 yards of petitioner's residence. Petitioner was paid every two weeks by Ragen and normally he either deposited or cashed his paycheck at one of the three financial institutions mentioned above. [4]
*430 Petitioner also maintained and personally managed a substantial investment portfolio, which included numerous corporate bonds and some corporate stocks. During the taxable years 1975, 1976, and 1977, he maintained a brokerage account with Reynolds Securities, Inc. (now known as Dean, Witter, Reynolds, Inc.). Petitioner had been buying corporate bonds for approximately 20 years and had occasionally purchased bonds through other brokers such as Bache & Company or Sartorious & Company. Petitioner's securities were not maintained in the street name. Petitioner took physical delivery on every bond he purchased and kept them in his possession and control at his residence or in his bank safety deposit box. For most of the bonds, petitioner received interest checks semiannually. For some of the stocks, he received dividend checks quarterly. When petitioner received a check representing interest payments, stock dividends, or proceeds from the sale of securities, he would normally endorse the check and deposit it into one of his accounts at Carteret, Midlantic or Broad. For the taxable years 1971 through 1977, petitioner prepared and filed his own Federal income tax returns (Forms *431 1040). Specifically, with respect to the taxable years 1975, 1976, and 1977, petitioner consulted with no one in preparing the returns he originally filed for those years. Petitioner lived alone and throughout the year he placed all his tax information for the current year in one desk drawer and used this information to prepare his tax returns. The Forms 1099 he received with respect to bond interest or stock dividends were also placed in this desk drawer. Petitioner knew that interest income and dividend income constituted taxable income. In addition, petitioner knew that a Form 1099 was pertinent to making out his tax return and he knew which figures on those Forms 1099 had to be reported as income. As set forth below in greater detail, petitioner consistently underreported his income over a seven-year period. From the taxable year 1971 through the taxable year 1977, petitioner omitted, in increasingly larger amounts each year, taxable income from his returns that he knew should have been reported. Most of the items of unreported income consisted of interest and dividends he received on his investment portfolio.
1971
Petitioner timely filed his Federal income tax *432 return (Form 1040) for the taxable year 1971. Petitioner reported gross income in the amount of $ 24,028.47 consisting of his wages from Ragen, his retirement pay from the Army, and $ 64.71 of interest income. The following is a schedule of the interest income received by petitioner and the interest income he reported on his 1971 Federal income tax return: Source of Income
Amount Received
Amount Reported
Greenwich Savings
$ 23.02
$ 23.02
U.S. Savings Bank
17.23
17.23
Barton Savings
24.46
24.46
Florida Power & Light
337.50
-0- Gulf & Western
780.00
-0- National Distillers
450.00
-0- Panhandle Eastern
325.00
-0- Montgomery Ward
325.00
-0- Total
$ 2,282.21
$ 64.71
Petitioner's 1971 return contained a detailed listing of his itemized deductions totaling $ 2,449, which included medical expenses, interest and taxes, miscellaneous deductions for dues, a lock box, a theft loss from his parked automobile, and both cash and noncash charitable contributions. The noncash contributions were substantiated with various receipts and a schedule attached to the return. Also attached were handwritten schedules showing petitioner's *433 calculation of his unreimbursed business mileage which he claimed as an employee business expense and the value of the property stolen from his automobile.
1972
Petitioner timely filed his Federal income tax return (Form 1040) for the taxable year 1972. Petitioner reported gross income in the amount of $ 25,368 consisting of his wages from Ragen, his retirement pay from the Army, and $ 85 of interest income. The following is a schedule of the interest income received by petitioner and the interest income he reported on his 1972 Federal income tax return: Source of Income
Amount Received
Amount Reported
Unknown
-- $ 85.00
Florida Power & Light
$ 337.50
-0- Gulf & Western
780.00
-0- National Distillers
450.00
-0- Panhandle Eastern
325.00
-0- Montgomery Ward
325.00
-0- Seaboard World Airlines
325.00
-0- U.V. Industries
345.00
-0- United Brands
302.50
-0- Total
$ 3,190.00
$ 85.00
Petitioner reported receiving $ 75 in total dividend income from unidentified sources which was fully offset by the $ 100 dividend exclusion. Petitioner actually received $ 150 of dividend income on his White Consolidated *434 Industries preferred stock and thus had $ 50 of unreported taxable dividend income in 1972. Petitioner acquired that stock in February of 1972 and received two quarterly dividend checks of $ 75 each that year. Petitioner's 1972 return also contained a detailed listing of his itemized deductions totaling $ 3,525, which included medical expenses, interest and taxes, miscellaneous deductions for dues, political contributions, a lock box, a theft loss from his parked automobile, and both cash and noncash charitable contributions. There was a schedule listing the cash contributions and a schedule together with receipts to support the noncash contributions. Also attached were handwritten schedules showing petitioner's calculation of his unreimbursed business mileage which he claimed as an employee business expense and a description of the property stolen from his automobile.
1973
Petitioner timely filed his Federal income tax return (Form 1040) for the taxable year 1973. Petitioner reported wages and salaries of $ 27,091. He also reported dividend income of $ 150 ($ 250,091. He also reported dividend income of $ 150 ($ 250 less the $ 100 exclusion) and interest income of *435 $ 489, both from unidentified sources. Petitioner actually received four quarterly dividend checks totaling $ 300 of dividend income on his White Consolidated Industries preferred stock and thus had an additional $ 50 of unreported taxable dividend income for 1973. In addition, the following is a schedule of the interest income received by petitioner and interest income he reported on his 1973 Federal income tax return: Source of Income
Amount Received
Amount Reported
Unknown
$ -0- $ 489.00
Florida Power & Light
337.50
-0- Gulf & Western
780.00
-0- Vernitron
575.00
-0- National Distillers
450.00
-0- Rapid American
600.00
-0- Panhandle Eastern
325.00
-0- Montgomery Ward
325.00
-0- Seaboard World Airlines
650.00
-0- U.V. Industries
345.00
-0- Rockwell International
536.24
-0- United Brands
605.00
-0- Reynolds Metals
225.00
-0- Total
$ 5,753.74
$ 489.00
On Schedule D attached to his 1973 return, petitioner reported a $ 1,869 long-term capital loss based on the worthlessness of two stock he owned. Attached to the return were copies of brokerage statements or confirmations reflecting *436 petitioner's cost basis and purchase dates of October 8, 1969 and December 11, 1969. Also attached were copies of separate letters dated in December of 1973 from petitioner's broker indicating that no market existed at that time for either of the above-mentioned stocks. Petitioner's 1973 return also contained a detailed listing of itemized deductions totaling $ 3,648, which included medical expenses, interest and taxes, charitable contributions and other miscellaneous items, and another loss due to a theft of property from his automobile. Petitioner also attached several handwritten schedules pertaining to the valuation of his noncash charitable contributions, his theft loss, and the calculation of his unreimbursed business mileage which he claimed as an employee business expense.
1974
Petitioner timely filed his Federal income tax return (Form 1040) for the taxable year 1974 and reported wages, salaries, etc., totaling $ 29,285. The following is a schedule of the interest income received by petitioner and interest income he reported on his 1974 Federal income tax return: Source of Income
Amount Received
Amount Reported
Montgomery Ward
$ 325.00
$ 325.00
Broad National Bank
287.50
287.50
W. T. Grant
118.75
118.75
Florida Power & Light
337.50
-0- Gulf & Western
780.00
-0- Vernitron
575.00
-0- National Distillers
450.00
-0- Rapid American
1,350.00
-0- Panhandle Eastern
325.00
-0- U.V. Industries
345.00
-0- Rockwell International
536.24
-0- United Brands
605.00
-0- Reynolds Metals
225.00
-0- Seaboard World Airlines
600.00
-0- Total
$ 6,859.99
$ 731.25
*437 In addition, the following is a schedule of the dividend income received by petitioner and the dividend income he reported on his 1974 Federal income tax return: Source of Income
Amount Received
Amount Reported
New York State Electric
$ 154.00
$ 154.00
Public Service Electric
& Gas
148.45
148.45
White Consolidated Ind.
300.00
-0- Total
$ 602.45
$ 302.45
On Schedule D attached to his 1974 tax return, petitioner reported a $ 2,268 long-term capital loss from the sale of two stocks in February of 1974. To substantiate this long-term capital loss, petitioner attached to his return copies of brokerage statements reflecting the purchases of such stock in February and October of 1968, and December of 1972, and the subsequent sales transactions in February of 1974. Moreover, petitioner's 1974 return contained detailed listings of his medical, charitable, and other itemized deductions totaling $ 3,800, and handwritten schedules reflecting calculations of his unreimbursed business mileage, the valuation of his noncash charitable contributions, and the valuation of property stolen from his automobile.
1975
Petitioner timely filed *438 his Federal income tax return (Form 1040) for the taxable year 1975 and reported wages, salaries, etc., totaling $ 33,356. The following is a schedule of the interest income received by petitioner and the interest income he reported on his 1975 Federal income tax return: Source of Income
Amount Received
Amount Reported
Montgomery Ward
$ 325.00
$ 325.00
United Nuclear Corp.
200.00
200.00
Reynolds Metals
225.00
225.00
National Distillers
450.00
200.00
Carteret Savings & Loan
992.19
-0- Seaboard World Airlines
725.00
-0- Eastern Airlines
1,225.00
-0- Rockwell International
536.24
-0- MacMillan
160.00
-0- Rapid American
1,500.00
-0- United Brands
605.00
-0- Gulf & Western
780.00
-0- Vernitron
575.00
-0- Amplex
550.00
-0- American Safety Equipment
230.00
-0- Niagara Mohawk Power
630.00
-0- General Telephone
& Florida
363.00
-0- U.V. Industries
345.00
-0- Ling Tempco Voight
1,000.00
-0- W. T. Grant Company
118.75
-0- Panhandle Eastern
325.00
-0- Florida Power & Light
337.50
-0- Midwestern Gas
388.00
-0- S.C.M.
362.00
-0- Newfoundland Labrador
Power
388.00
-0- Chicago, Milwaukee
& St. Paul R.R.
225.00
-0- Gulf & Western
275.00
-0- Harmon International
269.00
-0- Total
$ 14,104.68
$ 950.00
*439 In addition, the following is a schedule of the dividend income received by petitioner and the dividend income he reported on his 1975 Federal income tax return: Source of Income
Amount Received
Amount Reported
New York State Electric
$ 165.00
$ 165.00
Public Service Electric
579.00
187.00
White Consolidated Ind.
300.00
-0- Baltimore Gas & Electric
467.32
-0- Total
$ 1,511.32
$ 352.00
Petitioner also reported a $ 1,943 long-term capital loss, consisting of the worthlessness of two stocks and a $ 268 long-term capital loss carryover from 1974. Petitioner attached to his return copies of brokerage confirmations from 1969 and 1970 reflecting the purchase price of such stocks. He also attached a letter from his broker dated December of 1975, indicating that no market existed at that time for those two stocks. Also attached was a copy of the Schedule D from his 1974 return in regard to the long-term capital loss carryover he claimed. Petitioner failed to report a $ 2,375 long-term capital gain on the sale of Harmon International Bonds purchased in November 1974, and sold in June of 1975, which would have resulted in a net $ 699 long-term *440 capital gain for 1975 rather than the $ 1,943 long-term capital loss reported on his original 1975 tax return. On Schedule A attached to his 1975 tax return, petitioner again made detailed listings of his itemized deductions totaling $ 4,473. Petitioner also attached handwritten schedules showing details of his charitable contributions, calculations for his unreimbursed business mileage and the details of another property theft from his automobile.
1976
Petitioner timely filed his Federal income tax return (Form 1040) for the taxable year 1976 and reported wages, salaries, etc., totaling $ 33,175. The following is a schedule of the interest income received by petitioner and the interest income he reported on his 1976 Federal tax return: Source of Income
Amount Received
Amount Reported
Reynolds Metals
$ 225.00
$ 225.00
Montgomery Ward
325.00
325.00
Florida Power & Light
337.50
337.00
American Safety Equipment
230.00
115.00
Western Union
625.00
260.00
Niagara Mohawk Power
630.00
230.00
Seaboard World Airlines
1,100.00
-0- Eastern Airlines
1,461.00
-0- Rockwell International
536.24
-0- MacMillan
160.00
-0- Rapid American
1,500.00
-0- United Brands
880.00
-0- Gulf & Western
780.00
-0- Fruehauf
138.00
-0- Vernitron
575.00
-0- Ampex
550.00
-0- National Distillers
225.00
-0- Gulf & Western
138.00
-0- United Nuclear
100.00
-0- General Telephone
362.00
-0- Ling Tempco Voight
1,000.00
-0- Panhandle Eastern
325.00
-0- Midwestern Gas
388.00
-0- S.C.M.
362.00
-0- U.V. Industries
345.00
-0- Newfoundland Power
388.00
-0- Chicago, Milwaukee &
St. Paul R.R.
225.00
-0- Carteret Savings & Loan
2,620.75
-0- Total
$ 16,531.49
$ 1,492.00
*441 In addition, the following is a schedule of the dividend income received by petitioner and the dividend income he reported on his 1976 Federal tax return: Source of Income
Amount Received
Amount Reported
New York State Electric
$ 144.00
$ 144.00
Public Service Electric & Gas
621.00
387.00
White Consolidated Ind.
300.00
-0- Baltimore Gas & Electric
467.32
-0- New Idria
12.00
-0- Total
$ 1,544.32
$ 531.00
On Schedule D attached to his 1976 Federal tax return, petitioner reported a long-term capital loss in the amount of $ 5,000 resulting from a W. T. Grant Company debenture he held that had become worthless due to the bankruptcy of W. T. Grant Company. [5] Petitioner attached to his return a copy of the Notice of Default in regard to the W. T. Grant debenture. Petitioner failed to report on this Schedule D that on five separate occasions during 1976 he had sold stocks or bonds resulting in a long-term capital gain totaling $ 5,020. *442 On Schedule A attached to his 1976 tax return, petitioner again made detailed listings of his itemized deductions totaling $ 4,892. Petitioner also attached handwritten schedules showing details of his charitable contributions, calculations for his unreimbursed business mileage and the details of another property theft from his automobile. Petitioner also attached to his return copies of letters he had received from charities acknowledging his charitable contributions.
1977
Petitioner timely filed his Federal income tax return (Form 1040) for the taxable year 1977 and reported wages, salaries, etc., totaling $ 14,186 and military retired pay of $ 10,476. The following is a schedule of the interest income received by petitioner and the interest income he reported on his 1977 Federal tax return: Source of Income
Amount Received
Amount Reported
Reynolds Metals
$ 225.00
$ 225.00
Niagara Mohawk Power
630.00
315.00
United Brands
1,155.00
325.00
Rapid American
1,500.00
410.00
Western Union
625.00
260.00
Midlantic Bank
321.00
103.20
Seaboard World Airlines
1,325.00
-0- Eastern Airlines
1,700.00
-0- Rockwell International
536.24
-0- MacMillan
160.00
-0- Gulf & Western
780.00
-0- Fruehauf
275.00
-0- Vernitron
575.00
-0- U.V. Industries
345.00
-0- Ampex
550.00
-0- American Safety Equipment
230.00
-0- General Telephone
362.00
-0- Ling Tempco Voight
1,000.00
-0- Panhandle Eastern
325.00
-0- Florida Power & Light
337.50
-0- Montgomery Ward
325.00
-0- Midwestern Gas
388.00
-0- S.C.M.
362.00
-0- Carteret Savings & Loan
5,364.19
-0- Newfoundland Labrador Power
388.00
-0- Total
$ 19,783.93
$ 1,638.20
*443 In addition, the following is a schedule of the dividend income received by petitioner and the dividend income he reported on his 1977 Federal income tax return: Source of Income
Amount Received
Amount Reported
New York State Electric
$ 36.00
$ 140.00
Public Service Electric
& Gas
670.00
298.00
White Consolidated Ind.
300.00
-0- New Idria
15.00
-0- Baltimore Gas & Electric
467.32
-0- Buttes Gas & Oil
6.00
-0- Total
$ 1,494.32
$ 438.00
Petitioner also reported a loss of $ 1,000 and attached a handwritten schedule explaining that the $ 1,000 loss represented a long-term capital loss carryover from his 1976 tax return. Although petitioner reported no capital gain transactions for 1977, petitioner realized a long-term capital gain of $ 3,176 on various stocks or bonds he sold in August and September of 1977. Three of these sales involved stock of Ragen Precision Industries, petitioner's employer for 14 years. On Schedule A attached to his 1977 Federal income tax return, petitioner again made detailed listings of his various itemized deductions totaling $ 4,076. He also attached handwritten schedules showing details *444 of his charitable contributions, calculations for his unreimbursed business mileage, [6] and the details of another property theft from his automobile. Upon termination of his employment with Ragen in 1977, petitioner received severance pay from Ragen in 1977 in the amount of $ 28,046.10, which he failed to include as income when he prepared his 1977 Federal income tax return. The Form 1099-MISC, which petitioner received from Ragen; specifically listed the $ 28,046.10 as commissions and fees to nonemployees. From March 12, 1964 through June 3, 1977, the date he terminated his employment with Ragen, petitioner was a participant in Ragen's profit-sharing plan. Through 1976, petitioner had been credited with employer contributions totaling $ 4,922 and was 100 percent vested in those contributions. *445 Upon terminating his employment with Ragen on June 3, 1977, petitioner received a lump-sum distribution from Ragen's profit-sharing plan in the amount of $ 4,922, representing his vested interest in the plan. [7] Petitioner received a Form 1099R (Lump Sum Distributions from Profit-Sharing and Retirement Plans) from Ragen that clearly indicated that the entire distribution was includible as income, with $ 3,786 reportable as capital gain and $ 1,136 reportable as ordinary income. Petitioner failed to report any portion of this lump-sum distribution as income on his original or on his amended 1977 Federal income tax return. *446 Respondent has established that during the taxable years in issue, Forms 1099 were issued to petitioner on a timely basis by or on behalf of at least 17 companies reflecting either interest or dividends earned in those years as follows:[8]
1975
1976
1977
Baltimore Gas & Electric
* $ 467.32
* $ 467.32
* $ 467.32
White ConsolidatedInd.
300.00
300.00
300.00
National Distillers
450.00
225.00
-0-
Gulf & Western Industries
780.00
780.00
780.00
Vernitron
575.00
575.00
575.00
Florida Light & Power
337.50
337.50
337.50
United Brands
605.00
880.00
1,155.00
Montgomery Ward
325.00
325.00
325.00
Panhandle Eastern
325.00
325.00
325.00
Niagara Mohawk Power
630.00
630.00
630.00
Rapid American
1,500.00
1,500.00
1,500.00
Seaboard World Airlines
725.00
1,100.00
1,325.00
U.V. Industries
345.00
345.00
345.00
W. T. Grant Company
118.75
-0-
-0-
Rockwell International
536.24
536.24
536.24
Reynolds Metals
225.00
225.00
225.00
Carteret Savings & Loan
992.19
2,620.75
** 5,364,19
Total
$ 9,237.00
$ 11,171.81
$ 14,190.25
*447 As to those payors, in contrast, petitioner reported on his Forms 1040 only the following amounts of interest and dividend income: 1975
1976
1977
Montgomery Ward
$ 325
$ 325
$ -0-
Reynolds Metals
225
225
225
National Distillers
20
** -0-
-0-
Niagara Mohawk Power
** -0-
** 230
315
Rapid American
** -0-
** -0-
410
Florida Light
& Power
** -0-
337
** -0-
United Brands
** -0-
-0-
** 325
Total
$ 750
$ 1,117
$ 1,275
Sometimes these payors mailed the Forms 1099 to petitioner in the same envelope with the last interest or dividend check of the year or with the first interest or dividend check for the next year. Petitioner made similar omissions of income on his 1976 and 1977 State of New Jersey income tax returns as he did on his Federal income tax returns for those years. The following schedule reflects a comparison between the interest income petitioner reported for 1977 on his original return and the amounts shown on the Forms 1099 that petitioner had in his possession *448 and turned over to his attorney shortly after the tax investigation commenced: Amount
Per Forms
1099 in
Petitioner's
Amount
Company
Possession
Per Return
Difference
Rapid American
$ 1,500.00
$ 410.00
$ 1,090.00
United Brands
1,155.00
325.00
830.00
Vernitron
575.00
None
575.00
Western Union
625.00
260.00
365.00
Reynolds Metals
225.00
225.00
None
Midlantic Bank
103.20
103.20
None
Panhandle Eastern
325.00
None
325.00
Montgomery Ward
325.00
None
325.00
Niagara Mohawk Power
* 315.00
* 315.00
* None
$ 5,148.20
$ 1,638.20
$ 3,510.00
In other words, even as to the Forms 1099 that were admittedly in petitioner's possession, petitioner omitted 68 percent of these income items from his 1977 tax return. While an occasional Form 1099 may have gone astray and not been received by petitioner, the vast majority of the Forms 1099 from the companies in which he had investments was sent to and received *449 by petitioner. Petitioner deliberately omitted from his tax returns most of his interest and dividend income with the intent to evade taxes. In May of 1978, as a result of a computerized matching of petitioner's 1975 Federal tax return with Form 1099 information submitted by the various interest and dividend paying firms, Special Agent Michael O'Shea (O'Shea) of the Criminal Investigation Division of Internal Revenue Service contacted petitioner. O'Shea initially went to petitioner's personal residence and not finding him at home, left a calling card requesting petitioner to get in touch with him. Petitioner telephoned O'Shea the following day at which time O'Shea advised petitioner that he was the subject of an investigation and that he would like to speak with him. Later that same day, May 2, 1978, petitioner arrived at O'Shea's office. After informing petitioner of his constitutional rights, O'Shea, in a recorded interview, questioned petitioner concerning his 1975 and 1976 tax returns. At the outset petitioner was asked if all of his income had been reported on those returns, and petitioner stated that to the best of his knowledge at the time he prepared the returns all *450 income had been included on them. However, as the interview progressed and as petitioner learned how much O'Shea knew about his investments and about his dividend and interest income, petitioner became increasingly more nervous and agitated. In the course of the interview, which lasted approximately one-half hour, O'Shea informed petitioner that according to the records he had at that time, petitioner had reported only 10 percent ($ 900) of his total interest income ($ 9,000) and reported only about 25 percent of his total dividend income. O'Shea inquired specifically concerning petitioner's investments in six or eight companies and asked him why those companies were not reported on his returns. With respect to some of the companies, petitioner had no explanation and for others he indicated it was either an oversight or a result of poor record keeping. Petitioner indicated to O'Shea that he certainly felt obliged to pay any additional tax on the omitted interest and dividend income. After the interview was concluded, petitioner asked O'Shea what he should do. O'Shea informed petitioner that he (O'Shea) was in no position to render advice in that area and suggested to petitioner *451 that perhaps he should seek legal counsel. Petitioner immediately engaged legal counsel who first asked him to turn over all of the documents and information he had in regard to his taxes. Petitioner's counsel then put him in contact with John A. Kennedy, a certified public accountant, to review petitioner's tax returns, and if necessary, to prepare amended tax returns. Kennedy requested petitioner to bring him whatever information he might have in the form of records or backup data for deductions or income items, Forms 1099, Forms W-2, etc. However, after reviewing all the documents he received from petitioner, [9] Kennedy concluded that it was not possible to adequately prepare amended tax returns from that information. Kennedy then proceeded to collect the necessary information to properly prepare amended returns for petitioner. Petitioner contacted the Midlantic Bank and Carteret Savings *452 & Loan and requested duplicate Forms 1099, or a letter of some sort stating the amount of interest income he had received during the years in issue. Kennedy also personally reviewed every bond or security that petitioner had in his safety deposit box at the Midlantic Bank. Kennedy made a list of all the bonds and securities in the safety deposit box noting the purchase date, the company name, if any, the face amount of the bond, and the interest rate. He calculated the amount of dividend or interest petitioner would have received from each security during the years in issue. Some of the bonds were coupon bonds, and he could determine the interest from the coupon. He checked with brokers to make sure the bonds were active and used secondary sources such as Moody's Dividend Digest and Standard and Poors Dividend Record and Digest for the stocks petitioner owned. He also contacted two brokers that petitioner had dealt with over the years and received information that he was unable to obtain elsewhere about certain bonds held by petitioner. Based on the information he had collected, Kennedy prepared amended Federal tax returns (Forms 1040X) together with revised Forms 1040 for *453 the taxable years 1975, 1976, and 1977. He also prepared amended state returns for petitioner as well. However, due to lack of adequate substantiation, petitioner did not claim any itemized deductions or employee business expenses on the amended Federal tax returns for any of the years in issue. On September 8, 1978, petitioner filed an amended Federal income tax return (Form 1040X) for the taxable year 1977. The total adjustments made on this amended return increased petitioner's taxable income for such year by the amount of $ 52,570. On November 14, 1978, petitioner filed amended Federal income tax returns (Forms 1040X) for the taxable years 1975 and 1976. The total adjustments made on these amended returns increased petitioner's taxable income for the taxable years 1975 and 1976 by the amounts of $ 17,952 and $ 21,707, respectively. In a statutory notice of deficiency dated September 4, 1981, respondent determined that petitioner understated his taxable income in 1977 in the amount of $ 52,570 and that part of all of the resulting underpayment of tax was due to petitioner's fraud. The specific adjustments listed in the notice of deficiency correspond to the specific adjustments *454 as shown on petitioner's amended tax return filed for that year. In a statutory notice of deficiency dated October 30, 1981, respondent determined that petitioner understated his taxable income in 1975 and 1976 in the amounts of $ 18,891 and $ 23,615, respectively, and that part or all of the resulting underpayment of tax in each year was due to petitioner's fraud. The specific adjustments listed in the notice of deficiency include the specific adjustments as shown on petitioner's amended tax returns filed for the taxable years 1975 and 1976, plus additional unreported interest income in the amounts of $ 939 and $ 1,908 for the taxable years 1975 and 1976, respectively. On March 12, 1982, with petitioner having waived indictment, the United States Attorney for the District of New Jersey filed a two-count criminal information against petitioner, charging him with willfully attempting to evade and defeat a portion of his individual income tax liabilities for the taxable years 1975 and 1976 in violation of section 7201. On the same day, petitioner pleaded guilty to Count One of the criminal information charging him with willful evasion of his 1976 income tax liability in violation *455 of section 7201. Count Two of the information was dismissed in conjunction with the guilty plea entered by petitioner to Count One. ULTIMATE FINDINGS OF FACT 1. Petitioner had additional unreported income in 1977 in the form of interest of $ 345 and a lump-sum distribution of $ 4,922 from a profit-sharing plan. 2. Petitioner deliberately and intentionally filed false returns with the intent to evade taxes during the years before the Court, and all or part of the underpayments of tax were due to fraud on the part of petitioner. OPINION Deficiency Determinations
Petitioner having conceded the correctness of respondent's deficiency determinations as set forth in the notices of deficiency for all the years in issue, what remains for our consideration is respondent's claim for an increased deficiency for the taxable year 1977. Respondent has the burden of proof as to this "new matter." Rule 142(a). Respondent asserts an increased deficiency from additional unreported interest income from U.V. Industries in the amount of $ 345 and unreported income in the form of a lump-sum distribution from a profit-sharing plan totaling $ 4,922. With respect to the $ 345 of unreported *456 interest income from U.V. Industries, the parties stipulated that petitioner received $ 345 of interest income in 1977 from U.V. Industries, and the record clearly shows that petitioner failed to include this amount as income on either his 1977 original tax return or his amended tax return for that year. Thus, respondent has carried his burden of proof. Similarly, respondent has satisfied his burden of proof with respect to the unreported lump-sum distribution. Petitioner received a check from his employer, Ragen Precision Industries, Inc., in the amount of $ 4,922 in 1977. See n.7, supra. This check represented a lump-sum distribution from Ragen's profit-sharing plan in which petitioner had been a participant for 13 years. That lump-sum distribution of $ 4,922 constituted taxable income to petitioner in 1977, consisting of long-term capital gain in the amount of $ 3,786 and ordinary income in the amount of $ 1,136. These amounts were not reported as income on either petitioner's original 1977 Federal income tax return or his amended tax return for that year. Accordingly, we hold for respondent on this issue.
Section 6653(b) Fraud Additions
Respondent determined *457 that all or part of the underpayments of tax for the taxable years 1975, 1976, and 1977 were due to fraud under section 6653(b). [10] After filing his petition and before trial, petitioner conceded that he is collaterally estopped from denying the fraud addition for the taxable year 1976 due to his guilty plea in 1982 to violation of section 7201 for that year. [11] The underpayments of tax being admitted, we must decide whether all or part of the underpayment for each of the years 1975 and 1977 was due to petitioner's fraud. *458 Respondent bears the burden of establishing fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The fraud envisioned by section 6653(b) is actual, intentional wrongdoing and the intent required is the specific purpose to evade a tax believed to be owing. Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3rd Cir. 1968), cert. denied 393 U.S. 1020 (1969); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), followed on remand 45 B.T.A. 822 (1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), Supplemental Opinion 77 T.C. 324 (1981). Respondent must show that the taxpayer intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,supra,398 F.2d at 1004; Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion *459 of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Respondent must prove fraud in each of the years. Drieborg v. Commissioner,225 F.2d 216, 220 (6th Cir. 1955). Fraud is a question of fact to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied 389 U.S. 912 (1967), affg. 37 T.C. 703 (1962); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intention; therefore, the taxpayer's entire course of conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner, supra,67 T.C. at 200; Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra,53 T.C. at 105-106. *460 Specifically, we must consider the taxpayer's conduct and other circumstances surrounding the preparation, signing, and filing of the alleged fraudulent returns. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968), affg. on the issue of fraud a Memorandum Opinion of this Court. See also Wilson v. Commissioner, supra,76 T.C. at 634. In this fraud case, which as usual is quintessentially a factual matter, petitioner's arguments seem to be that this Court, as a matter of law, cannot find fraud. The two main thrusts of petitioner's arguments are (1) that the Court should disregard most of the evidence in the record, the vast majority of which is undisputed, and (2) that the Court cannot rely on circumstantial evidence to establish fraudulent intent or that filing a false tax return is not an affirmative act of fraud. Petitioner's first argument comes in the guise of challenging as irrelevant all facts other than those specifically occurring in 1975, 1976, and 1977. Petitioner would have us ignore undisputed facts as to his education, work experience, tax-return-preparation history, and investment history. While fraud must be proved for *461 each year, that does not confine the fact finder to the narrow straits petitioner insists upon. In support of his argument, petitioner cites two criminal tax cases. Besides the obvious difference in burden of proof, this civil tax proceeding in the Tax Court cannot be considered as "identical to the situations presented" in Baines v. United States, 426, F.2d 833 (5th Cir. 1970) and Flemister v. United States,260 F.2d 513 (5th Cir. 1958), as petitioner argues. Baines involved a criminal conviction for willful failure to pay the Federal cabaret tax. It was the first and only case in which any taxpayer had ever been tried criminally for failure to pay the cabaret tax. There was a serious question as to exactly what constituted a "cabaret," and the case was tried three years after the cabaret tax statute had been repealed. The Fifth Circuit pointed out that it was a very close case and while there was no single error "when viewed in isolation" that warranted reversal, the cumulative effect of a number of alleged reversible errors warranted a new trial. In reversing and remanding for a new trial, the Fifth Circuit expressly stated, "We limit our holding *462 to the facts peculiar to this rare case involving the failure to pay federal cabaret excise taxes." 426 F.2d at 835. Thus, it was in this context that the Fifth Circuit made the following statement relied upon by petitioner: Thus, if the jury were to find that a taxpayer's return for the year in question was false, it would similarly conclude that the other tax returns were false thereby indicating a course of conduct in establishing either intent or willfulness. The net result of this is to place upon the defendant the onerous task of defending against evasion charges which are not the subject of the indictment. [426 F.2d at 841.]
The Court in a bench trial in the Tax Court is not going to be confused as to where the burden of proof lies, and petitioner is not going to be put to an "onerous task" of proving anything. Here respondent has clearly and convincingly established the amounts of interest and dividend income received each year over a seven-year period. The amount of interest and dividend income reported each year is clearly shown by petitioner's tax returns which he prepared and subscribed to under penalty of perjury. We can think *463 of no reason why a court in a bench trial should disregard those virtually undisputed facts, most of which are set out in the parties' stipulations of fact. A jury might be confused, for example, by hearing evidence of understatements of income for a barred year, as the Fifth Circuit pointed out in Flemister v. United States, supra,260 F.2d at 518, but that was a net worth case. Items on a net worth statement are interrelated, and care must always be taken in a net worth case to prove items on the net worth statement by evidence independent of the mere net worth statement itself. Here, we are dealing with a specific items case, the specific omission of interest and dividend income, and we will not be confused. As the Fifth Circuit has observed, excluding evidence on the basis of "unfair prejudice" is a useless procedure in a bench trial. Gulf States Utilities Co. v. Ecodyne Corp.,635 F.2d 517, 519 (5th Cir. 1981). The undisputed evidence here clearly and convincingly shows a pattern of substantial omission of that income over a seven-year period. *464 Petitioner's argument would mean in effect that a court could not consider evidence of a pattern of conduct, and we think that is not the law. Neither the criminal cases relied upon by petitioner nor the rules of evidence require us to put on blinders for all years except 1975, 1976, and 1977 and to pretend that petitioner sprang forth newborn on January 1, 1975. Accordingly, we reject petitioner's relevancy objections. A consistent pattern of underreporting substantial amounts of income over a period of several years, standing alone, is strong evidence of an intent to evade taxes. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner,276 F.2d 122, 129 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Brooks v. Commissioner,82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985); Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). The record in this case clearly establishes a consistent *465 pattern of omitting substantial amounts of interest and dividend income over a seven-year period from 1971 through 1977. The amount of unreported income steadily increased each year over that seven-year period. During the three years before the Court, petitioner failed to report a total of over $ 46,000 of interest income and over $ 3,000 of dividend income. Stated another way, over this three-year period petitioner failed to report approximately 92 percent of his interest income and approximately 71 percent of his dividend income. These substantial omissions take on a greater significance in light of petitioner's educational background and employment history. We do not have before us a taxpayer with limited education who lacks knowledge of rudimentary business practices. [12] Rather, petitioner is a retired Lieutenant Colonel of the United States Army. He has the equivalent of a four-year college education with some concentration of courses in business administration, accounting, and office management. At the time he retired from the Army, petitioner was the Finance Officer in the Office of the Comptroller at Fort Dix, New Jersey. Subsequent to his retirement from the Army, *466 petitioner was employed full time with Ragen Precision Industries from 1963 until his second retirement in June of 1977. At the time of his retirement from Ragen, petitioner held the office of corporate vice president and was chief of the component manufacturing division, Ragen's largest division. He was also one of five inside members of the board of directors of this publicly held corporation. With this background, we found petitioner's claim that those substantial omissions resulted from oversight and his poor record keeping incredible and wholly unworthy of belief. Based on all the facts and circumstances, we have concluded that petitioner filed false and fraudulent tax returns in 1975, 1976, and 1977. In reaching that conclusion, we have relied on the earlier returns as part of a seven-year pattern of petitioner's consistently omitting, in increasingly larger amounts each year, most of his interest and dividend income. However, there is also the same clearly discernable, and even more pronounced, pattern just in the three years before the Court. Petitioner omitted over 90 percent of his *467 interest income and over 70 percent of his dividend income each year. Thus, as to interest and dividend income, we have concluded petitioner's tax returns were nothing more than "works of fiction," [13] and that petitioner knew they were "works of fiction." The second major thrust of petitioner's arguments, while couched in terms of the "affirmative conduct" test of Spies v. United States,317 U.S. 492 (1943), is either an argument that this Court cannot rely on circumstantial evidence to establish a taxpayer's fraudulent intent or that filing false returns is not an affirmative act of fraud. We cannot accept either argument. *468 In civil tax fraud cases involving failure to file returns, courts frequently discuss the "affirmative conduct" or the "affirmative indication," i.e., commission as opposed to omission, required to prove fraud. [14] The oft-stated rule is that mere failure to file is not, without more, proof of fraud. See Kotmair v. Commissioner,86 T.C. 1253 (1986), a recent failure-to-file case in which we applied that general rule. Since the present case is not a failure-to-file situation and since petitioner attempts to apply Spies and its progeny beyond their intended sphere, we think a brief review of Spies is warranted.
*469 In Spies, the Government argued that two misdemeanors (willful failure to file and willful failure to pay), without more, equaled the felony of attempted tax evasion. Tax evasion, either the crime or the civil case, is always an "attempt" because if successful the taxpayer would get away with it and there would be no case, criminal or civil. In this context the Supreme Court discussed the concept of "affirmative action" as follows: The difference between the two offenses, it seems to us, is found in the affirmative action implied from the term "attempt," as used in the felony subsection. It is not necessary to involve this subject with the complexities of the common-law "attempt." The attempt made criminal be this statute does not consist of conduct that would culminate in a more serious crime but for some impossibility of completion or interruption or frustration. This is an independent crime, complete in its most serious form when the attempt is complete, and nothing is added to its criminality by success or consummation, as would be the case, say, of attempted murder. Although *470 the attempt succeed in evading tax, there is no criminal offense of that kind, and the prosecution can by only for the attempt. We think that in employing the terminology of attempt to embrace the gravest of offenses against the revenues, Congress intended some willful commission in addition to the willful omissions that make up the list of misdemeanors. Willful but passive neglect of the statutory duty may constitute the lesser offense, but to combine with it a willful and positive attempt to evade tax in any manner or to defeat it by any means lifts the offense to the degree of felony. [Fn. ref. omitted. 317 U.S. at 498-499.] The Supreme Court was mindful that Congress had not defined or limited the methods of willful attempt to evade tax. The Supreme Court itself refused to define the crime in a manner that might "by definition constrict the scope of the Congressional provision that it may be accomplished 'in any manner.'" 317 U.S. at 499. The Supreme Court then went on to give examples as follows: By way of illustration, and not by way of limitation, *471 we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affair to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal. * * * [Emphasis supplied. 317 U.S. at 499.]
Ignoring the Supreme Court's stricture that these were by way of example "and not by way of limitation," petitioner tries instead to use these examples as a definitive checklist for proof of fraud. Petitioner conveniently overlooks the most telling "affirmative conduct" or "affirmative indication" of fraud, the intentionally false and fraudulent tax returns he filed. In on the earliest of the failure-to-file cases applying the Spies test, the Eighth Circuit clearly distinguished the two situations. First Trust and Savings Bank of Davenport, Iowa v. United States,206 F.2d 97 (8th Cir. 1953). There the Eighth Circuit pointed out that: The teaching of the opinion *472 of this court in Cave v. United States, 8 Cir., 159 F.2d 464, is to the same effect as that of the Supreme Court in the Spies case. In the Spies case, the conviction for felonious attempt to evade tax was reversed because the necessary showing of "some willful commission" was lacking. But the conviction of Cave for the same criminal offense was sustained in this court because it was shown that Cave had filed income tax returns which "were deliberately false and fraudulent." In other words, he was guilty of the "wilful commission" of fraudulent acts to defeat tax that lifted his offense to the gravest of offenses against the revenues. In the opinion (written for this court by Judge Thomas), complete analysis was made of the Spies case and the distinction between the lesser offenses involving only wilful failure of taxpayers to perform a duty and the gravest offense involving "wilful commission" of fraudulent acts were made "too clear to permit confusion". [206 F.2d at 101.]
The Eighth Circuit also cited with approval the Third Circuit's decision in United States v. Croessant,178 F.2d 96 (3rd Cir. 1949). 206 F.2d at 100. *473 In the Croessant case, the Third Circuit dealt with the taxpayer's argument that if failing to file a return is not fraud under Spies than filing a false return should not be fraud. The Third Circuit, in language peculiarly apt for the instant case, soundly rejected that argument as follows: A man who files no return has made no misrepresentation. He has simply failed to do what the statute requires him to do. But the man who files a wilfully false return has endeavored to mislead his government. He creates the appearance of having complied with the law, whereas his neighbor who has filed no return does no such thing. Not only has he created the appearance of complying, but that apparent compliance stands a good chance of remaining unattacked, for the tax authorities cannot possibly audit every taxpayer's return every year. There is substance, we think, in distinguishing between failing to file a return and knowingly filing a false one. There is also good common law analogy for such a distinction both in the tort rules regarding liability for obtaining money under false *474 pretenses. The law has always distinguished between failing to disclose useful information and making a disclosure which is a lie. [Fn. ref. omitted. 178 F.2d at 97.] The language quoted above was also quoted with approval by the Eighth Circuit in First Trust and Savings Bank of Davenport, Iowa, supra, and was also quoted with approval by the Tenth Circuit in Zell v. Commissioner, supra. Moreover, the Third Circuit in United States v. Coressant,178 F.2d 96, 98 (3rd Cir. 1949) was also cited with approval the Eighth Circuit's opinion in Cave v. United States,159 F.2d 464 (8th Cir. 1947). Thus, whatever possible differences there may be in the test these circuits apply in failure-to file cases, and we think it is likely more semantics than substance (n.14, supra), the various circuits speak one voice in the case of a taxpayer filing intentionally false returns. And here the Court has no difficulty in finding that petitioner deliberately and intentionally filed false returns with the intent to evade taxes. The amounts of petitioner's interest and dividend income from 1971 through 1977 are essentially *475 undisputed, and the fact that the vast majority of that interest and dividend income was omitted by petitioner over a seven-year period is shown by his tax returns. Petitioner prepared his own returns. The record clearly and convincingly establishes that the various payors of the interest and dividends not only sent checks to petitioner (semiannually for most of the interest and quarterly for most of the dividends) but also sent him a Form 1099 each year. Petitioner was aware that interest and dividends were taxable income; he was aware that the Forms 1099 showed the amount he was to report on his tax returns. Petitioner testified that during the year he placed the materials for his tax returns in one desk drawer at his home, and each year he used that material to prepare his tax returns. Petitioner lived alone, and lived at the same residence from at least March of 1971 until the time of trial. The record shows the companies sent Forms 1099 to petitioner at his correct home address. See n.8, supra.
Petitioner still argues, rather astonishingly, that respondent "failed to prove that any of the Forms 1099 * * * were sent to or received by Petitioner." While petitioner was *476 entitled, as he did, to put respondent to his proof, petitioner cannot now ask the Court to ignore the proof. See n.8, supra. Respondent called as witnesses the custodians of the records from the various companies who testified as to their records and their method of sending out Forms 1099. Merely because these custodians cannot testify of their personal knowledge that a Form 1099 was mailed to petitioner each year, as petitioner seems to demand, does not undermine the force of their testimony. Personal knowledge is not necessary. Rule 803(6), Federal Rules of Evidence.
Respondent clearly and convincingly established that large number of Forms 1099 were sent to petitioner and that the amounts thereon were not reported by petitioner on his tax returns. While petitioner sought to establish that sometimes a Form 1099 goes astray, and that no doubt is true, one of the custodians testified that such errors happened in less than one percent of the forms. If petitioner were arguing that one percent or perhaps even as high as 5 to 10 percent of the Forms 1099 somehow went astray, the Court could possibly accept that. But petitioner failed to report over 90 percent of his interest *477 income and over 70 percent of his dividend income. For the period 1971-1977, petitioner omitted his interest income in the following percentages -- 97 percent, 97 percent, 92 percent, 89 percent, 93 percent, 91 percent, and 92 percent, respectively. Petitioner cannot expect the Court or any fact finder to believe that the vast majority of his Forms 1099 somehow went astray. Also petitioner testified he put any Forms 1099 he received into the one desk drawer where he kept his tax materials. To suggest that somehow most of those Forms 1099 mysteriously disappeared from that drawer each year for seven years (or even for the three years before the Court) is inherently incredible. [15] The Court found petitioner to be evasive and did not believe his testimony. Much more telling is what happened in regard to Forms 1099 that admittedly were in petitioner's possession. Of the tax materials that petitioner turned over to his own counsel soon after the tax investigation commenced (and which were produced at trail), there were some Forms 1099 to petitioner's tax return shows that petitioner, even when he retained the Forms 1099, did not report the full amounts or sometimes any amount on *478 his tax return. Lastly, there is the matter of petitioner's purported health problems that allegedly somehow made him unable to deal with numbers or accounting matters. In the first place, these purported health problems were not established by any competent, probative evidence. The Court did not believe petitioner's testimony in that regard, particularly his suggestion that his age had something to do with his problems. Besides petitioner's relative youthfulness, being ages 58 through 64 in the seven-year period he prepared the returns before the Court, and petitioner's responsible corporate position, the Court is impressed by the fact that petitioner had no trouble keeping track of documentation for his deductions. Only the income side of petitioner's returns seemed to suffer from petitioner's purported diminishing capacity to handle numbers or accounting matters. [16] Petitioner still continued to handle his investments. Petitioner took physical delivery of each bond he purchased *479 and kept them in his possession. Petitioner still continued to handle his banking activities. There is no indication that petitioner ever lost any interest or dividend checks or ever failed to clip coupons on his bonds. In fact the record shows that some of the companies sent the Forms 1099 in the same envelope with either the last interest or dividend check for the year or the first interest or dividend check for the next year. Wile petitioner allegedly could not keep track of the Forms 1099, he seemed to have no trouble keeping track of the checks. *480 Moreover, it is inconceivable that petitioner forgot about the interest he earned on a savings account he maintained at Carteret Savings when he visited that institution at least once every two weeks in 1975, and personally maintained a passbook savings book from Carteret in which the interest earned on that account was periodically posted in a separate column. Moreover, petitioner also received a Form 1099 from Carteret Savings each year. Petitioner also could not explain how he forgot to report interest in 1975 from a W. T. Grant debenture, but had reported such interest in 1974. However, he apparently referred to his 1974 return to substantiate his claimed long-term capital loss carryover. We also find it significant that in the midst of his alleged memory lapse as the to the companies from which he received interest and dividend payments in 1975, he managed to remember he owned 200 shares of stock in Electrocopy Corporation and Western Art Corporation, which he claimed became worthless in 1975 and reported long-term capital losses with respect to those shares. He also managed to locate and attach to his 1975 return copies of brokerage statements from 1969 and 1970 reflecting *481 his purchase price of the shares. We further find it significant that petitioner managed to recall and to provide in detail on a handwritten schedule the numerous charitable contributions he made in 1975. In sum, it appears that petitioner's poor record keeping and memory lapses pertained to income items only, since petitioner apparently had full recollection of every deduction and loss he was entitled to claim on his 1975 Federal income tax return. With respect to the taxable year 1977, petitioner similarly omitted interest income he received on about 20 corporate bonds, interest on his savings account, interest on a certificate of deposit at Carteret Savings, and about $ 1,000 of dividend income he received. On Schedule B attached to that return, petitioner listed only six companies and reported total interest income of $ 1,638.20. Petitioner testified that at the time he prepared his 1977 Federal tax return, he only remembered those six companies and the omissions were simply a result of his poor record keeping. Once again, we find his story totally unbelievable. Petitioner derived interest income from approximately 25 different sources in excess of $ 19,000 during 1977. *482 It is inconceivable that petitioner did not know he was substantially understating his interest income on his 1977 Federal tax return when he listed on Schedule B only six companies and total income of $ 1,638.20. In particular, at the time he prepared his 1977 return, petitioner did not recall the bonds he owned from Florida Power and Light, American Safety Equipment, or Montgomery Ward, although he listed these companies on his 1976 tax return and should have listed them on his 1977 tax return. Nevertheless, petitioner managed to recall the $ 5,000 long-term capital loss he reported in 1976 and claimed a $ 1,000 long-term capital loss carryover on his 1977 tax return. However, petitioner conveniently forgot to report in 1977 the gain on three separate sales transactions of his employer's stock and the sale of a bond of U.V. Industries. At trial petitioner again blamed this omission on his bad record keeping. Petitioner also testified that at the time he listed the Midlantic Bank on his 1977 tax return and reported interest of $ 103.20 derived therefrom, he did not recall any other interest from a financial institution that he should have reported. However, during 1977, petitioner *483 made deposits of approximately $ 70,000 to his passbook savings account at Carteret Savings. Not only is Carteret within 100 yards of his residence, the interest generated by this account during 1977 was again posted quarterly in a separate column in his savings account passbook, and he also received a Form 1099 from Carteret. Moreover, petitioner could not explain why the Form 1099 from Rapid American, which petitioner had in his possession and subsequently turned over to his attorney, shows interest paid in 1977 in the amount of $ 1,500, when he reported only $ 410. Similarly, petitioner could not explain why he reported only $ 325 of interest income from United Brands when the Form 1099 shows interest paid in 1977 totaling $ 1,155. Petitioner also received in 1977 severance pay in the amount of $ 28,046.10 from Ragen at the time he terminated his employment. Although the Form 1099-MISC that petitioner received clearly shows the severance pay as commissions and fees to nonemployees, petitioner testified that he failed to report it as income in 1977 because he did not think the severance pay was taxable. Petitioner, consulted with no one in making this determination. In *484 addition, petitioner received a lump-sum distribution in the amount of $ 4,922 from Ragen's profit-sharing plan when he terminated his employment with Ragen in 1977. Petitioner failed to report any portion of this distribution as income in 1977 even though the Form 1099R he received from Ragen clearly provides that the distribution should have been reported as capital gain and ordinary income in the amounts of $ 3,786, and $ 1,136, respectively. At trial, petitioner could not give any explanation for this omission. While petitioner asserts that most of the omissions of income his 1977 tax return occurred because of his poor record keeping and his convenient lapse of memory, petitioner managed to recall and list in detail, on Schedule A attached to his 1977 Form 1040, itemized deductions totaling $ 4,076. In summary, we have based our conclusion that petitioner intentionally filed false tax returns upon the omission of substantial and increasingly larger amounts of interest and dividend income over a period of years, most egregiously in the three years before the Court, upon omission of certain other specific items of income in the three years before the Court, and upon the fact *485 that petitioner in most instances received the Forms 1099 reflecting that interest and dividend income. While petitioner argues there is no evidence of record destruction, he either destroyed those Forms 1099 or he simply withheld them from his counsel and respondent. Petitioner knew that interest and dividends must be reported as income. He also knew that Forms 1099 were pertinent to preparing his tax returns and knew which figures on Forms 1099 had to be reported as income. At the time petitioner filed his Federal tax returns for 1975 and 1977, we are satisfied from the record as a whole that petitioner knew he was underreporting his taxable income in each of those years. We conclude that petitioner knew exactly what he was doing -- i.e., evading the payment of his Federal income tax liability. The evidence clearly and convincingly establishes that petitioner underpaid his taxes in 1975 and 1977, and that all or part of the underpayment in each such year was due to petitioner's fraud. Accordingly, petitioner is liable for the section 6653(b) fraud additions. To reflect the concessions and our holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. The apparent incongruity between the amount of the deficiency and the amount of the fraud addition for the taxable year 1977 is due to the credit given for the amount of tax assessed and paid with respect to the amended tax return (Form 1040X) filed for that year. ↩
3. After trial and at the time of filing his opening brief, respondent moved to amend his answer to conform the pleadings to the proof and to assert an increased deficiency and increased addition pursuant to section 6214(a). The Court allowed the amendment to answer over petitioner's objection. See Koufman v. Commissioner,69 T.C. 473↩ (1977) and the cases discussed therein. 4. The Court has carefully examined his checking account check register from 1974 through the end of 1977. The check register indicates that petitioner kept rather low balances in his checking account and wrote relatively few checks (mainly rent, utilities, and a few checks to charities or to the Internal Revenue Service). The Court concludes that most of his paychecks were converted to cash, and only small amounts were deposited into his checking account. The Court also concludes from his check register that petitioner dealt primarily in cash for food, clothing, health care, transportation, personal purchases, and recreation. Noticeably absent were any payments by check to retail stores or to credit card accounts, although petitioner in each year deducted interest expenses on installment purchases and credit card purchases. When a substantial deposit of $ 1,000 or more was made into the account, a check for most of the account balance would normally be issued shortly thereafter, usually to the Carteret Savings account or to petitioner's broker. Thus, the Court further concludes that petitioner practiced careful money management, keeping only minimal balances in his checking account. ↩
5. We note that petitioner used the face value of the bond rather than his cost basis to compute his loss. As shown on his amended return prepared by an accountant, his cost basis in this bond was $ 1,488. ↩
6. We note that for each of the taxable years 1971-1976 petitioner reported total mileage of 21,000 and for 1977 18,000 miles. On his 1971 return, he claimed 20 percent of the total as business related, for 1972 he claimed 25 percent as business related, for 1973-1975 he claimed 30 percent as business related, and for 1976-1977 he claimed 35 percent of the total as business related. ↩
7. Petitioner signed a Statement of Termination form, dated June 3, 1977, stating that: "I hereby acknowledge the termination of my interest in the profit sharing plan based on the above statement [showing amount due of $ 4,922]." On brief petitioner seems to deny he ever received that amount, but his checking account check register lists a deposit of $ 4,922 made between checks dated 6-2-77 and 6-7-77, and on June 9, 1977, petitioner issued a check for $ 4,500 to Carteret Savings. The Court is satisfied that petitioner received both the check in the amount of $ 4,922 and the Form 1099R explaining the taxability of that amount. ↩
8. Despite clear and convincing evidence to support this finding, petitioner continues to argue that respondent failed to prove that any of the Forms 1099 were sent to or received by him. Respondent elicited testimony from nine witnesses, all of whom were employees of various organizations that collectively issued either interest or dividend checks and Forms 1099 to petitioner with respect to his investments in each of the companies listed. The witnesses testified that their respective employers in the regular course of business maintained records of the interest and dividend payments made each year and also in the regular course of business issued Forms 1099 to all payees. Some of the witnesses produced duplicate Forms 1099, which were subsequently offered and received in evidence, that their respective employers issued to petitioner during the years in issue. Others testified that a review of their employer's records indicated that Forms 1099 were in fact issued to petitioner during the years in issue. In any event, we are satisfied from the record as a whole that Forms 1099 were timely issued to petitioner and he received them prior to filing his Federal tax returns for each of the years in issue indicating the amount of interest or dividend earned on investments in the companies listed.↩
*. The parties stipulated to the figure of $ 467.32 (para. 73), but the Forms 1099 show $ 467.52. The Court has used the lower figure stipulated by the parties. It was stipulated by the parties that the amounts actually received from these companies were in excess of what was reported.
**↩ Petitioner's amended 1977 tax return listed a figure of $ 5,495.00, but the parties stipulated to figures of $ 2,364.19. The Court has used the lower figure stipulated by the parties. *. For Niagara Mohawk Power, petitioner produced only the "accumulation" Form 1099 accompanying the first interest check for 1977 rather than the year-end Form 1099 showing the actual $ 630 in yearly interest.↩
9. It is unclear whether these are the same documents that petitioner turned over to his attorney at the time he sought professional help. However, petitioner's counsel produced at trial in response to respondent's subpoena certain documents that petitioner had turned over to him. ↩
10. As in effect during the years in issue, section 6653(b)↩ provided as follows: (b) Fraud. -- If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * 11. See Tomlinson v. Lefkowitz,334 F. 2d 262 (5th Cir. 1964), cert. denied 379 U.S. 962 (1965); Artic Ice Cream Co. v. Commissioner,43 T.C. 68 (1964); Amos v. Commission,43 T.C. 50 (1964), affd. 360 F. 2d 358↩ (4th Cir. 1965). 12. See, i.e., Bartlett v. Commissioner,T.C. Memo. 1986-479↩. 13. We have not, however, drawn certain inferences that a fact finder might reasonably draw from other suspicious items on those returns. For example, for seven years in a row petitioner claimed a loss from theft of items from his parked automobile. In claiming his unreimbursed employee business expenses, petitioner claimed for six years in a row that his total mileage each year was 21,000 miles, but with the business use percentage rising from 20 to 25 to 30 to 35 percent. ↩
14. It is sometimes stated that the Spies "affirmative conduct" test is applied in the Fifth, Eighth, and Tenth Circuits. Jones v. Commissioner,259 F.2d 300 (5th Cir. 1958); First Trust & Savings Bank of Davenport, Iowa v. United States,206 F.2d 97 (8th Cir. 1953); Zill v. Commissioner,763 F.2d 1139 (10th Cir. 1985), affg. a Memorandum Opinion of this Court. It is also sometimes stated that the Third Circuit has refused to apply the Spies "affirmative conduct" test and applies instead an "affirmative indication" test. Stoltzfus v. United States,398 F.2d 1002, 1005 (3rd Cir. 1968); Cirillo v. Commissioner,T.C. Memo. 1985-587 and Paddock v. Commissioner,T.C. Memo. 1985-586↩, two more failure-to-file cases where these two approaches are again discussed. Assuming this is something more than a semantical quibble without a difference, we note that the present case is not a failure-to-file case and that, in any event, any appeal in this case would lie to the United States Court of Appeals for the Third Circuit. 15. The Court did not believe petitioner's lame attempt, on questioning by the Court, to intimate that his housekeeper somehow may have had something to do with this purported disappearance. ↩
16. Nor is the Court persuaded otherwise by the fact that on at least four returns petitioner made minor computational errors that each time resulted in a small refund of taxes to him. As most taxpayers are aware, minor computational errors are routinely caught and corrected by the Internal Revenue Service. However, before the computer-matching program became fully operational, the Service could not routinely detect omissions of income items such as interest and dividends. The care with which petitioner noted the refunds of these small amounts on his tax records satisfies the Court that petitioner could and did keep careful records of his tax matters. Moreover, keeping track of the Forms 1099 was simply a matter of retaining the forms and adding up the figures; it was hardly a matter of dealing with accounting or computational operations. ↩